[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14509
Non-Argument Calendar
_____

D.C. Docket No. 8:13-cv-01416-PDB

LEIGH AYN D. LAUREY,

                                                              Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

                                                              Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 1, 2015)

Before HULL, WILSON and ROSENBAUM, Circuit Judges.

PER CURIAM:

Leigh Ayn D. Laurey appeals the district court's order affirming the

Commissioner of Social Security Administration's ("Commissioner") denial of her

application for disability insurance benefits ("DIB"), pursuant to 42 U.S.C. § 405(g).  After a thorough review of the record, we affirm.

## I.  FACTUAL BACKGROUND

### A.    DIB Application

On December 20, 2011, Laurey filed her application for DIB, alleging a disability onset date of February 6, 2006.  Laurey identified these medical conditions: (1) upper and lower back injury, (2) post-traumatic stress disorder (PTSD), (3) migraine headaches, (4) bilateral knee problems, (5) major depression, (6) fibromyalgia, and (7) reactive airway disease.  After her application was denied initially and on reconsideration, Laurey requested a hearing before an administrative law judge ("ALJ").

### B.    ALJ Hearing

At the September 2012 administrative hearing, Laurey testified as follows. Laurey had previously worked as a sheriff deputy in a jail, a police drill instructor, a military police officer, and an auto parts specialist, but had not worked since February 2006.  Laurey was treated at the Veterans Affairs ("VA") facility for migraine headaches, fibromyalgia, and chronic back pain.[1]  Laurey had about two or three migraines per month, had fibromyalgia pain in her arms, shoulders and back, and often experienced tingling in her hands and dropped things as a result.

---

[1]At the hearing, Laurey testified she was receiving 100% VA disability benefits.

2

Laurey took hydrocodone for her pain, cyclobenzaprine for muscle relaxing, and Cymbalta for the fibromyalgia, all of which made her feel tired. Laurey took sumatriptan for her migraines, which made her sleep for eight hours.

As to her daily activities, Laurey took her daughter to the school bus and then spent about three-quarters of the day resting on the couch or in bed. Her daughter helped Laurey with laundry by loading the clothing into the machines. Laurey's husband cooked the meals and did the dishes. Laurey had a bench and a special shower head to help her take showers. Laurey was unable to do any exercise, could sit for only ten to fifteen minutes before experiencing pain, would get up and walk around for five to ten minutes and then sit back down, could stand for about five minutes, and could lift five pounds.

## C.     Medical Records

### 1.  2004 Military Records

According to Laurey's medical records,[2] in January 2004, after Laurey's military service in Iraq, she had back pain and underwent a lumbar MRI at Eisenhower Army Medical Center at Fort Gordon. The MRI showed normal bony structures, intact disc spaces, and no evidence of a herniated or bulging disc. At the L5-S1 level there was "bilateral neural foraminal narrowing mild on the right

---

[2]Because on appeal Laurey raises issues related only to her fibromyalgia and chronic back and knee pain, we discuss only the information from her medical records related to those impairments.

3

and moderate on the left." In April 2004, Laurey underwent an MRI of the cervical spine with normal results.

In June 2004, Laurey had a fibromyalgia evaluation at Eisenhower's rheumatology clinic. Laurey reported pain in her neck, low back, and knees, daily headaches, constant pain "'all over,'" lethargy, and difficulty sleeping, with an "onset of symptoms after having a back injury in August 2003." An examination showed "18/18 tender points of fibromyalgia" bilaterally. Laurey was already taking tramadol and gabapentin, among other medications, and was prescribed amitriptyline.

2. 2006 VA Pain Clinic

In September 2006, Laurey visited the pain clinic at the Tampa VA hospital. Consultation notes stated that Laurey complained of upper and lower back pain that began while she was deployed in Iraq, and "secondary bilateral pain in her knees . . . and feet." Although Laurey was diagnosed with fibromyalgia, the notes indicated that "her current description of her pain problems do not suggest that this is an appropriate label as she has several specific issues and no diffuse muscle aches, etc." Laurey was able to ambulate independently, although she displayed mild pain behaviors. Laurey identified her pain level as a "6/7 on a scale of 0-10," and reported that she currently treated her pain with Motrin and Excedrin, and had used medication, physical therapy, kinesiotherapy, and massage in the past.

4

Laurey was recommended for pain management treatment at the pain clinic, but Laurey preferred to pursue treatment through her private primary care physician.

   3. 2007 to 2010 at Bay Pines VA Medical Center with Dr. Frailing

   In 2007, Dr. Kathy Frailing at Bay Pines VA Medical Center began treating Laurey for: (1) chronic back and knee pain, (2) chronic headaches, (3) depression, (4) obesity, (5) hypertension, and (6) hyperlipidemia.  Laurey sought treatment in February, June, July, and October 2007, for her chronic pain.  Dr. Frailing prescribed hydrocodone for pain and a muscle relaxer.

   In August 2007, Laurey underwent a general medical evaluation in relation to her status as a veteran.  The examination notes indicated that Laurey was "currently a homemaker," stopped work in 2005 after having a baby and stayed home to care for her baby.  Laurey had lost work in the past twelve months because "she can not take Hydrocodone and work at the sheriff's office."  As to her fibromyalgia, Laurey reported no effect on her "usual occupation" or activities of daily living, except that she avoided sitting or standing longer than 30 minutes at a time.  Laurey described constant pain that improved (to 4 or 5 out of 10) with medication, which included hydrocodone and Ibuprofen three times a day.  Laurey avoided: (1) lifting over 15 or 20 pounds; (2) sitting or standing longer than 30 minutes, (3) and bending over.  Physical examination showed "widespread pain"

5

with multiple trigger points for fibromyalgia and a limited range of motion in her lumbar spine. Her strength was 5/5 throughout.

In March 2008, Laurey visited Dr. Frailing for her chronic back and knee pain. Laurey's neck was bothering her more. Dr. Frailing referred Laurey for an MRI on her cervical spine, which was performed in May 2008. The results showed "mild disc bulges at C4-C5, C5-C6, and C6-C7 without spinal canal or foraminal stenosis." In addition, there was "no significant hypertrophic degenerative change." The impression was "[m]ild degenerative changes of the cervical spine with mild disc bulges present at C4-C5, C5-C6, and C6-C7." A week later, a neurologist, Dr. Safe Ul Huda, examined Laurey. Notes from the neurological exam state "Sensory Intact," "Motor 5/5," "DTR 2," "COORD F-N wnl," and "Gait WNL." Dr. Huda reviewed a recent CT of Laurey's brain and the MRI of her spine and noted they were "[n]egative study."

At a September 2008 follow-up, Laurey reported continuing back and neck pain and that her TENS unit helped, but was falling apart. Dr. Frailing continued Laurey's medications and ordered a new TENS unit. In a February 2009 follow-up visit, Laurey complained of back pain that worsened when standing and reported that, on some days, she took two hydrocodone to manage the pain. Dr. Frailing increased Laurey's hydrocodone, prescribed baclofen for muscle spasms, and scheduled thoracic and lumbar spine MRIs.

6

Both MRIs were performed that same month and showed only minor abnormality. In particular, findings from the thoracic spine MRI indicated no "significant canal narrowing," although there was a small focal central protrusion at the T11-T12 level, and a left central protrusion at the T7-T8 level. The impression was "[m]ild disc disease" at the T7-T8 and T11-T12 levels. The lumbar spine MRI revealed a "mild diffuse disc bulge" but "no significant canal or neural foramen narrowing" at the L3-L4 and L4-L5. At L5-S1, there was a disc bulge, but the "neural foramina and spinal canal remain[ed] patent." The impression was "[m]ild disc disease with no significant canal or neural foramen narrowing."

In a March 2009 letter to Laurey, Dr. Frailing wrote:

The mri showed some "mild" disc disease but no impingement on the spinal cord or the nerves coming out from the cord. This disc disease is mostly represented by some flattening of the discs and/or mild bulging which may be causing your pain. I would continue your current therapy and we could consider physical therapy as well but no intervention [is] deemed necessary.

In June 2009, Laurey reported that the baclofen worked well but lasted only six hours, that her pain was "under decent control" and that she was able to function effectively on the current treatment plan. Dr. Frailing increased the baclofen dosage and renewed Laurey's other medications. At visits in June 2009 and May, October, and November 2010, Laurey's chronic back pain was described as "improved control," and her chronic knee pain and headaches were "stable."

7

At the May 2010 visit, Laurey expressed concern that she was building a tolerance to hydrocodone, so Dr. Frailing weaned down the hydrocodone and began morphine. In October 2010, Dr. Frailing increased Laurey's morphine dosage after Laurey reported that she did not think it was helping her pain. In November 2010, Laurey called the VA clinic's pharmacy and reported that the morphine dosage was "too strong," causing sedation, and requested a change to Lorcet, which is hydrocodone mixed with acetaminophen. Dr. Frailing discontinued morphine and prescribed Lorcet.

### 4. 2011to 2012 at Bradenton VA Clinic with Dr. Carnahan

By April 2011, Laurey had transferred to the VA clinic in Bradenton, where she was treated by Dr. Catherine Carnahan. Laurey reported that Lorcet was "not really helping the pain" but if she went off the Lorcet "the pain [was] unbearable." Dr. Carnahan increased Laurey's Lorcet dosage to the maximum dose. In an October 2011 letter, Dr. Carnahan advised Laurey that she was on the maximum dose of hydrocodone for pain, and that, as a narcotic for which Laurey could develop a tolerance over time, hydrocodone was "not the best choice for long-term chronic pain."

In a December 2011 visit, Laurey stated that she did "not feel that Lorcet [was] helping, but that it was better than nothing." Dr. Carnahan indicated that "opioid treatment" provided "[a]dequate control" of Laurey's chronic pain "at this

8

time for most of the day, but [would] require further monitoring and refinement of the plan." Dr. Carnahan continued Laurey's current treatment plan, but noted that if there were no significant changes in Laurey's "lifestyle, functioning or symptoms[,] the pain treatment plan [would] be reassessed in 90 days."

At her annual check-up in March 2012, Laurey said her pain had worsened since losing weight and reported back spasms involving her upper and lower spine. Dr. Carnahan discontinued baclofen and prescribed cyclobenzaprine as a muscle relaxant. Dr. Carnahan advised Laurey not to have a lumbar spine MRI unless Laurey was considering "possible epidural injections or surgery."

Laurey also expressed interest in trying Cymbalta "to address both her chronic pain and depression." Laurey told Dr. Carnahan that she had already tried gabapentin, which caused her to gain weight, and amitriptyline, which did not help her pain. As part of the treatment plan, Dr. Carnahan noted that Cymbalta would need a non-formulary consult and documentation that Laurey had "failed amitriptyline and gabapentin." Laurey agreed that she would discuss Cymbalta at her next VA psychiatry appointment, and later agreed to be weaned off venlafaxine and try Cymbalta.[3]

---

[3]Laurey had been taking venlafaxine since 2007 to manage her depression. In October 2011, management of Laurey's psychotropic medications was transferred from Laurey's psychiatrist, Dr. Mitchell Cannell, to Dr. Carnahan.

9

In April 2012, Dr. Carnahan submitted a non-formulary request to begin Laurey on a 30-day trial of Cymbalta (duloxetine) for her fibromyalgia and mood disorder, which was approved. As justification, Dr. Carnahan stated that Laurey had shown her "military medical records" indicating that Laurey had "'failed PT and nsaids,'" was prescribed Elavil (amitriptyline) and gabapentin, which were not helpful, and "was even given methadone for her chronic pain."

## D.    Personal Reports

In 2008, Laurey completed several pain questionnaires in which she stated that: (1) she experienced constant pain in her neck, hips, knees, shoulders, and upper and lower back; (2) her hands cramped when grasping something for a long period of time and she frequently dropped things; (3) standing or sitting for long periods of time, walking, and lifting caused pain; (4) she could not lift more than 20 to 25 pounds or sit or stand for more than thirty minutes; (5) hot and cold conditions exacerbated her fibromyalgia symptoms; (7) her pain medications provided only short-term relief and caused excessive drowsiness, forgetfulness, and clumsiness; and (6) due to her inability to concentrate, she could not remember simple instructions unless they were written down.

Also in 2008, Laurey and her husband periodically completed function reports in which they indicated that Laurey: (1) cared for their three-year-old daughter and pets; (2) did laundry, prepared simple meals, went grocery shopping,

and cleaned lightly; (3) rested frequently in between bursts of activity and took all day to perform household chores; (4) often woke up during the night due to pain; and (5) had no problems with her personal care.  Both Laurey and her husband indicated that she could walk between a quarter and a half mile, depending upon the day.  Laurey reported that her pain affected her ability to lift, squat, bend or climb stairs; to stand, walk or sit for long periods; concentrate; and to use her hands.

### E.　　Consultants' Physical RFC Assessments

Two state medical consultants completed physical residual functional capacity ("RFC") assessments.  In June 2008, Dr. Murthy Ravipati concluded that Laurey could: (1) lift and carry 20 pounds occasionally, and 10 pounds frequently; (2) stand, walk, or sit six hours in an eight-hour workday; (3) push or pull unlimited, only restricted by her lifting and carrying ability; (4) occasionally climb ramps, stairs, ladders, ropes, or scaffolds; (5) frequently balance, stoop, kneel, crouch, and crawl; but (6) should avoid concentrated exposure to extreme heat and cold and hazards such as machinery and heights.

Dr. Ravipati concluded that Laurey's claims about her symptoms and their effect on her function were only "partially credible."  Noting Laurey's normal 2008 MRI of her cervical spine and neurological exam, Dr. Ravipati opined, based

on Laurey's "overall condition," that her symptoms were not so severe as to render her totally disabled, as follows:

> This is a 36-year-old female alleging disability from chronic back pain and fibromyalgia. . . . Even though [s]he is complaining of symptomatology, there is mention of a normal MRI of the C-spine. . . . The MRI of the LS spine is showing neuroforaminal narrowing without any herniated disc[.]  As per the recent exam of May 2008, there are no motor sensory deficits and having equal reflexes and having independent gait.  Therefore, taking overall condition into consideration, only moderate reductions are given . . . .  I do not believe the severity of the fibromyalgia supports total disability at this time.

In June 2009, Dr. P.S. Krishnamurthy completed a physical RFC assessment for Laurey, reporting findings similar to those of Dr. Ravipati.  Dr. Krishnamurthy found Laurey's reported symptoms to be only "partially credible," and he noted that Laurey was "being treated symptomatically."  After reviewing the results of the 2009 MRIs of her thoracic and lumbar spine showing only a "mild degree of degen changes" and "mild disc disease," Dr. Krishnamurthy wrote, "[s]he has normal neuro exam with normal sensory and motor exam and DTRs [and]. . . [g]ait is normal."  In addition, Dr. Krishnamurthy stated that Laurey was "able to do personal care[,] cook[,] shop[,] wash clothes[,] and wash dishes[,] sweep[,] drive[,] and pet care[,] lift 25lbs[,] and walk 1/4 to 1/2 mile."

## F.    ALJ's Decision

Based on this record, the ALJ concluded that Laurey was not disabled. Applying the five-step process, the ALJ found that (1) Laurey had not engaged in

12

substantial gainful activity since February 2, 2006; (2) Laurey's fibromyalgia, degenerative disc disease, osteoarthritis of the knees, depression,  anxiety, and PTSD were severe impairments; (3) these impairments alone and in combination did not meet or equal the severity of one of the listed impairments; (4) Laurey could not perform any of her past relevant work, but had the RFC to perform a wide range of light work; and (5) a significant number of such jobs existed in the national economy.

With respect to Laurey's RFC at step four, the ALJ found that Laurey could (1) lift or carry 20 pounds occasionally and 10 pounds frequently; (2) stand or walk for 6 hours in an 8-hour workday; (3) push and pull unlimited; (4) frequently climb ramps and stairs, balance, stoop, crouch, kneel, or crawl; (5) hear, understand, remember, and carry out simple, routine or moderately complex work instructions; (6) deal with changes in a routine work setting; (7) learn work rules, accept instruction, and respond appropriately to supervision on a sustained basis; (8) interact appropriately with co-workers, supervisors, and the general public; (9) maintain attention and concentration sufficiently to be productive and complete an 8-hour workday and a 5-day workweek; and (10) be aware of common hazards in the workplace and take appropriate precautions.

In determining Laurey's RFC, the ALJ accorded some weight to the opinions of consulting physicians Dr. Ravipati and Dr. Krishnamurthy, but

13

explained that their opinions were not given full weight because neither had examined Laurey.  The ALJ found that evidence submitted after the doctors' RFC assessments showed that Laurey was "not as limited as previously determined by these doctors," and that the treatment for her back and knee pain was "conservative and sporadic in nature."

Considering Laurey's statements as to the intensity, persistence, and limiting effects of her medical conditions, the ALJ found Laurey credible only to the extent that her complaints were consistent with the ALJ's RFC finding.  The ALJ noted that medical records showed (1) only mild degenerative changes in the cervical spine, mild disc disease in the thoracic spine, and mild degenerative disease of the lumbar spine; (2) Laurey's chronic back and knee pain were described as stable; (3) although Laurey had some reduced range of motion in her lumbar spine and knees, her grip strength was 5/5 and her gait was normal; and (4) since Laurey's fibromyalgia diagnosis in 2004, her medical records "d[id] not reflect significant complaints related to this disease or . . . significant specialized treatment."

The ALJ explained that she did not accept Laurey's subjective complaints that were inconsistent with the RFC finding because "radiographic imaging . . . showed only mild findings and physical examinations revealed only mildly decreased range of motion," Laurey's "[t]reatment was essentially routine and conservative" and "was generally successful in controlling her symptoms."  The

14

ALJ noted that, although Laurey "reported that Lorcet was not helping her pain 'much,' she stated that it was 'better than nothing' and in fact preferred Lorcet to morphine," and "progress notes . . . show she tolerate[d] her medication well without side effects."  The ALJ concluded that "the medical evidence of record does not support the claimant's alleged limitations prior to the date last insured."

Using the Medical-Vocational Guidelines as a framework, the ALJ concluded that, although Laurey could not perform all the exertional demands for light work, her limitations "had little or no effect on the occupational base of unskilled light work."  Accordingly, the ALJ determined that Laurey was "not disabled" and denied benefits.

## G.    District Court Proceedings

After the Appeals Council denied Laurey's request for review, Laurey filed a complaint in the district court requesting review of the Commissioner's denial of her application for DIB.  The magistrate judge affirmed the Commissioner's decision.[4]

## II.  STANDARD OF REVIEW

We review the ALJ's decision for substantial evidence, and the ALJ's application of legal principles de novo.  Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "Substantial evidence is more than a scintilla and is such relevant

---

[4]The parties consented to proceed before a magistrate judge.  28 U.S.C. § 636(c).

15

evidence as a reasonable person would accept as adequate to support a conclusion." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011). We may not decide the facts anew, make credibility determinations, or re-weigh the evidence. Moore, 405 F.3d at 1211. Furthermore, credibility determinations are the province of the ALJ, and we will not disturb a clearly articulated credibility finding supported by substantial evidence. Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995). To the extent that an ALJ commits an error, where the error did not affect the ALJ's ultimate determination, the error is harmless. See Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error doctrine to a Social Security appeal).

## III.  DISCUSSION

### A.    Five-Step Evaluation

A claimant for DIB bears the burden of proving she is disabled. 42 U.S.C. § 423(a)(1); Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003). To be eligible for benefits, the claimaint must show that she was disabled on or before the last date for which she was insured. 42 U.S.C. § 423(a)(1)(A); Moore, 405 F.3d at 1211.

In order to determine whether a claimant is disabled, the ALJ applies a five-step sequential evaluation. 20 C.F.R. § 404.1520(a). Under this five-step process, the ALJ considers: (1) whether the claimant is engaged in substantial gainful

activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether the claimant's impairments meet or equal the criteria contained in one of the Listings of Impairments; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of her age, education, and work experience, a significant number of jobs exists in the national economy that the claimant can perform. Id. § 404.1520(a)(4)(i)-(v).

On appeal, Laurey raises two arguments with respect to the ALJ's determination of Laurey's RFC and whether, at steps four and five, there was work she could perform. Specifically, Laurey argues that the ALJ erred by failing: (1) to discuss the weight to be assigned to Dr. Frailing's opinion that Laurey's back pain was caused by degenerative disc changes; and (2) to ascribe any of Laurey's alleged pain to her fibromyalgia, instead attributing it all to her degenerative disc and knee conditions.

## B.    Dr. Frailing's Opinion

In determining at steps four and five whether a claimant can perform her past relevant work or other work, the ALJ must determine the claimant's RFC by considering all relevant medical and other evidence. Phillips v. Barnhart, 357 F.3d 1232, 1238-39 (11th Cir. 2004); see also 20 C.F.R. § 404.1520(e). In assessing RFC, the ALJ must state with particularity the weight given to different medical

17

opinions and the reasons for doing so.  Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987).

"Medical opinions are statements from physicians and psychologists and other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). A treating physician's medical opinion "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (quotation marks omitted); see also 20 C.F.R. § 404.1527(c)(2) (stating that the treating physician's opinion that is well-supported and not inconsistent with other evidence receives "controlling weight").  Further, "[t]he ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); see also 20 C.F.R. § 404.1527(c)(2) (requiring the ALJ to "give good reasons" for not giving weight to a treating physician's opinion).

The ALJ must explain the weight given to "obviously probative exhibits." Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  However, there is no "rigid requirement that the ALJ specifically refer to every piece of evidence, so

18

long as the ALJ's decision . . . is not a broad rejection" that leaves this Court with insufficient information to conclude that the ALJ considered the claimaint's medical condition as a whole. Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

On review, we find no reversible error. Although the ALJ never stated the weight given to Dr. Frailing's treatment notes, the ALJ discussed the content of Dr. Frailing's notes, showing that the ALJ considered and gave weight to this medical evidence.

Laurey points to Dr. Frailing's March 2009 letter to Laurey, contained in the VA progress notes, in which Dr. Frailing discussed the results of Laurey's thoracic and lumbar MRIs. In the letter, Dr. Frailing states that the "mild" disc disease shown in the MRIs, in particular the "flattening of the discs and/or mild bulging[,] . . . may be causing [Laurey's] pain."

Contrary to Laurey's argument, Dr. Frailing's letter did not opine upon the severity of Laurey's pain, the extent to which Laurey's mild disc disease or the resulting pain impaired her ability to function, what Laurey could do despite any impairments, her prognosis, or any physical restrictions. Accordingly, Dr. Frailing's letter does not contradict the consulting physicians' RFC assessments or the ALJ's RFC determination.

19

Instead, Dr. Frailing's medical opinion is limited to the possible cause of Laurey's pain. While the ALJ did not explicitly address this opinion, nothing in the ALJ's decision is inconsistent with it. Indeed, the ALJ, citing the VA progress notes, seems to have fully accepted that Laurey's chronic neck, back, and knee pain were caused by her mild degenerative disc disease shown on the MRIs. Thus, to the extent the ALJ should have explicitly stated that she was giving significant or controlling weight to Dr. Frailing's opinion about the cause of Laurey's chronic back, neck, and knee pain, any error was harmless. See Dorio, 721 F.3d at 728.

## C.    Laurey's Fibromyalgia

When a claimant attempts to establish disability based on her pain or other subjective symptoms, a three-part "pain standard" applies. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002); SSR 96-7p, 62 Fed. Reg. 34483 (July 2, 1996). The pain standard requires: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." Barnhart, 284 F.3d at 1225; see also 20 C. F.R. § 404.1529(a)-(b). If the ALJ determines that the claimant has a medically determinable impairment that could reasonably produce the pain or other symptoms, then the ALJ evaluates the extent to which the intensity and persistence of those symptoms limit the claimant's ability to work.

20

20 C.F.R. § 404.1529(b).  At this stage, the ALJ considers the claimant's history, the medical signs and laboratory findings, the claimant's statements, statements by medical sources, and other evidence of how the pain affects the claimant's daily activities and ability to work.  Id. § 404.1529(c).

The ALJ uses these same standards to evaluate a claimant's fibromyalgia, which is "characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."  SSR 12-2p, 77 Fed. Reg. 43640, 43641 (July 25, 2012).  The symptoms of fibromyalgia "can wax and wane so that a person may have 'bad days and good days.'"  Id. at 43644.  For this reason, "longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of [fibromyalgia]."  Id. at 43642, 43644.  "If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects" of the fibromyalgia symptoms, the ALJ will "consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate the symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms."  Id. at 43643.

21

A claimant's testimony supported by medical evidence that satisfies the pain standard is sufficient to support a finding of disability.  Foote, 67 F.3d at 1561.  If the ALJ decides to discredit the claimant's testimony about her symptoms, the ALJ must adequately explain the reason for doing so.  Id. at 1561-62.

Here, the ALJ applied the pain standard, finding that Laurey's medically determinable impairments "could reasonably be expected to cause some of the alleged symptoms," but then found that Laurey's "statements concerning the intensity, persistence and limiting effects of these symptoms" were credible only to the extent they were consistent with the ALJ's RFC determination.   The ALJ's reason for partially discrediting Laurey was that her claimed limitations were not supported by the medical evidence.  With respect to Laurey's fibromyalgia in particular, the ALJ noted that Laurey "was diagnosed in 2004 after physical examination revealed 18/18 tender points," and that Laurey "reported classic [fibromyalgia] symptoms," but that her medical records between February 2, 2006 (her alleged onset date) and December 31, 2011 (her date of last insured) did "not reflect significant complaints related to this disease or . . . significant specialized treatment."

In light of the ALJ's discussion of fibromyalgia, we reject Laurey's claim that the ALJ "totally disregarded" her fibromyalgia.  Cf. Vega v. Comm'r of Soc. Sec., 265 F.3d 1214, 1219 (11th Cir. 2001) (vacating and remanding where the

ALJ did not address the claimant's diagnosis of chronic fatigue syndrome ("CFS") or evaluate the effects of her CFS symptoms).  Further, we do not agree that the ALJ attributed Laurey's pain exclusively to her degenerative disc and joint disease. In fact, the ALJ implicitly credited some of Laurey's alleged pain to fibromyalgia by concluding that her fibromyalgia constituted a severe impairment.[5]  The ALJ highlighted Laurey's degenerative disc and joint disease as the main source of her pain because the medical record did not reflect significant complaints or specialized treatment related to fibromyalgia.

Substantial evidence supports this conclusion.  Although the medical record reflects the fibromyalgia diagnosis in 2004 and 2007, subsequent notes from Dr. Frailing and Dr. Carnahan, Laurey's treating physicians, relate almost exclusively to treatment for chronic back, neck, and knee pain, and chronic headaches. Notably, in her 2007 medical evaluation, Laurey reported that her fibromyalgia did not impact her ability to work or perform daily tasks, beyond limiting her time for sitting and standing to 30 minutes at a time.  One of the consulting physicians, Dr. Ravipati, opined that the severity of Laurey's fibromyalgia did not support a total

---

[5]The mere fact that the ALJ determined that Laurey's fibromyalgia was a "severe impairment," however, does not mean that the ALJ was required to attribute severe pain to her fibromyalgia.  See McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (explaining that a claimant's "burden at step two is mild" and "allows only claims based on the most trivial impairments to be rejected").  Moreover, Laurey provides no authority for the proposition that the ALJ was required explicitly to apportion Laurey's pain among her severe impairments before evaluating the pain's intensity, persistence and limiting effects.  To the contrary, the ALJ is required to evaluate the "combined impact" of a claimant's impairments on her ability to work. See 20 C.F.R. §§ 404.1520(c), 404.1523.

23

disability finding. And, the record was devoid of any opinion from a treating or examining physician that Laurey's fibromyalgia imposed any functional limitations, let alone functional limitations greater than those found by the ALJ.

Laurey points to progress notes in March and April 2012 when Dr. Carnahan prescribed Cymbalta for her fibromyalgia and depression. These progress notes show that Dr. Carnahan agreed to begin Laurey on a 30-day trial of Cymbalta at Laurey's request. To justify this non-formulary request, Dr. Carnahan noted that other fibromyalgia medications, such as amitriptyline and gabapentin, prescribed by military doctors in 2004, had not proved helpful. These facts do not undermine the ALJ's finding that for a five-year period between 2006 and 2011, Laurey had not complained of, or received significant treatment for, her fibromyalgia, as distinct from her "musculoskeletal problems" of chronic back, neck, and knee pain.

To the extent Laurey argues otherwise, the ALJ also clearly articulated the reasons for concluding that Laurey's claims as to the severity of her pain and its impact on her ability to function were only partially credible. See Foote, 67 F.3d at 1561-62. The treatment notes and MRI results described Laurey's degenerative disc disease as "mild" and her treatment plan as conservative, consisting of pain medication, muscle relaxers, and physical therapy. Her chronic back pain was described as "improved control" and her chronic knee pain was "stable." Notably, in her March 2009 letter, Dr. Frailing stated that no intervention was necessary.

24

Furthermore, Laurey's 2007 physical assessment showed that, although Laurey had some reduced range of motion in her lumbar spine and knees, she had 5/5 strength and walked with a normal gait.  Both Dr. Ravipati and Dr. Krishnamurthy concluded, based on a review of Laurey's medical records, that Laurey's allegations about her symptoms were only partially credible and opined that she could perform the physical exertion requirements, such as sitting, standing, walking and lifting, for light work.  See 20 C.F.R. § 404.1567(b).  And Laurey's own statements, as well as the statements submitted by her husband, showed that she was able to care for herself and her daughter and do light housework.

For all these reasons, we conclude that substantial evidence supports the ALJ's determination that Laurey was not disabled.  See Moore, 405 F.3d at 1211; Dyer, 395 F.3d 1211.  Any error committed by the ALJ in failing to specifically discuss Dr. Frailing's opinion or attribute some of Laurey's pain to her fibromyalgia was harmless because it did not affect the ALJ's ultimate determination.  See Diorio, 721 F.2d at 728.

**AFFIRMED.**